# Naftzinger *versus* Roth.

1. In a proper case the rights of parties under a parol contract for sale of land may be settled in assumpsit; but the plaintiff must show that his right of action had accrued before its commencement.

2. In such an action the plaintiff is not entitled to a conditional verdict, to enforce specific performance of the verbal contract to convey land, until he clearly shows that he has strictly complied with all the terms of the agreement.

3. Assumpsit will not lie to recover the value of improvements upon the defendant's land where the plaintiff remains in uninterrupted enjoyment of the improvements, and the land appurtenant thereto.

March 5th 1880.　Before SHARSWOOD, C. J., GORDON, PAXSON, TRUNKEY and STERRETT, JJ.　MERCUR and GREEN, JJ., absent.

Error to the Court of Common Pleas of *Berks county:* Of January Term 1879, No. 197.

Assumpsit by Daniel Roth against Philip Naftzinger, for breach of a verbal contract by the defendant to convey certain land to the plaintiff.

At the trial, before Sassaman, A. L. J., Roth testified: "I am a blacksmith; am nephew of defendant. He lived in the spring-house upon his property. I made an agreement with Naftzinger in the spring of 1871. He said he was old; could no longer work; I should move to his property; build house, barn and blacksmith-shop; he wanted to live on the premises, and if I lived longer than he I should have the property; he said he must live on the land, but if we could not live together, and were quarrelsome, he would move away, and I must pay him the interest of $1500 as long as he lived. This was the agreement, and upon this I built. In the first place, the agreement was—he should not live with me because it would cost too much for building for the first few years. He had money himself, and it cost me too much to build; then I should board him. He had reserved for him a room in the new house. Under this agreement, I built on the premises, and I wanted to give him the board right away; he didn't take it long. I built house, stable and blacksmith-shop; made garden fences; put lime on land, and planted trees. * * * If I had to pay for

[Naftzinger *v.* Roth.]

boarding to work hands and money expended, it would be about $3000. * * *

" On November 13th 1872, I went into possession of this new house. I commenced building in the spring of 1872. According to what Naftzinger said, it is 30 acres of land. * * * Naftzinger lived with me one and one-half years, as near as I can say; so long I furnished the boarding. He left in October 1874, I think, as near as I know. He said the boarding was not good enough for him; not clean enough. * * * In the beginning it was said there should be papers made. After I had the house up partly, the people got talking about my putting up the house without papers. I told him; he said he would have it written, but he would not die that week, and asked me to see Esquire Haak; I saw Esquire Haak; he did not do it; then after that he said no more about it; this was before I lived there; he boarded with me; the papers were not begun to draw up." * * *

Roth, on cross-examination, testified: " The understanding was that Naftzinger was to board with me and have the interest from me of $1500 at the same time. * * * I paid no interest on the $1500. Until the agreement is finished I do not think I owe any. Since October 1873, I had the income of the place; not worth much; place too poor. I can't say when we first spoke of a writing, but it was during the winter, before building. After the building was up and I think the plasterers in, I spoke to him about the writing. He said we would make it, but he would not die that week. Then I did not speak again; I thought he should then speak. Before I began building, I was to go to Esquire Haak to see if he could make the writing. Naftzinger spoke first about it. After it was started, nothing was said till plasterers were in house. There was more than twice spoken about the writing. During the winter it was often spoken; perhaps three or four times spoken about putting it in writing, but it was never done."

P. Naftzinger testified: " I own the land in dispute—30 acres. I was 72 years old July 15th 1876; I meant I was too old to live alone; I thought I wanted help. He and his wife came to me four years ago; we spoke about it; they wanted to come to me; I told the wife it might make a good deal of trouble; we then talked about till we came to my house; then I said they might tear down the old house and might build a new one; I told them I wanted to live with them, but perhaps it was too late for that year.

" There was a bargain he must pay me interest of $1500, but I would board with him, when one could. There were so many people there during building that it would not suit. The $1500 I said he must pay me as I needed, until I had enough, and I must be buried at the end; I was to have part of this money when I needed it; I was to have the interest of the money till I needed more; then

[Naftzinger v. Roth.]

after I had needed more I wouldn't get the interest any more in full. Before the building was torn down he came often; some other people came about making a bargain, then he came oftener; we were together first in the smith-shop; then we spoke; it was in the winter, towards spring, that we talked about it; that was the first time we talked about it; after that he came to see me at my house; during that time Roth was up at Esquire Haak's to see if he could make it, but I did not send him up. He said Haak had said he should just go on with the building; he said Haak said he could draw it if no legal heirs were here. Before the building was torn down we both thought we were too smart; we needed no writing. After the house was torn down he commenced building the new house; pretty complete; then he said there ought to be a barn built; I said, Yes, he should; he built a blacksmith-shop before the barn, I guess; he wanted to work in it, or I guess he would not have built it; he got the wood for the house from the place, but not all; too dry to saw it. When they were plastering, he came down and asked me for the right, the deed; I then said I would not give up my deed yet; I would not die yet; I wanted a bond to lay on the land; some one to read it first; I would lay it on the land; Roth did not say what he wanted it for; he didn't speak of it after. * * * For allowing Roth to have the land and build on I wanted this bond, so that I was safe; I wanted to live on the land; he was to give me the interest every year for my clothes, and if it was not enough, some of the principal."

There was also in evidence a notice dated December 4th 1874, served by the defendant upon the plaintiff to quit all the land "except such as may be necessary to the use of the buildings thereon, and next adjacent to said buildings."

The ninth point of defendant, which the court refused, was: "From the whole evidence shown in this case, the plaintiff has shown no cause of action, and no recovery can be had."

The court instructed the jury to bring in a special verdict, who found as follows:—

"Jury returns that they find in favor of the plaintiff the sum of $2955.78. The judgment to be released if within thirty days after final judgment on the verdict Philip Naftzinger tenders and files in this suit a deed from himself to Daniel Roth, his heirs and assigns for a tract of land in Upper Bern township, containing 30 acres, more or less, and subject to the following conditions: That Philip Naftzinger shall have the use, during his natural life, of the back room of the new house, and that Daniel Roth, his heirs and assigns, shall and will, furnish Naftzinger all necessary food, victuals and board and attendance; and if the said Roth and Naftzinger cannot agree together, in lieu of board, food, victuals and attendance, the said Roth shall pay to Naftzinger, annually, the

[*Naftzinger v. Roth.*]

interest on fifteen hundred dollars ($1500) during his (Naftzinger's) natural life."

In entering judgment on the verdict, the court, inter alia, said:—
" When this case was on trial, we were considerably perplexed about it. It was evident to us that the parties to this suit had got themselves into a condition by their contract relations which they hardly understood themselves at any time, and by which after an attempt to execute it, they only got into a worse state of understanding, in fact, into actual misunderstanding. From the demeanor of the parties towards each other, one would have really supposed that there was no comprehensible contract relation between them. Owing to this apparent uncertainty, during the trial we were unable to arrive at any fixed notions of the law, which should control our own legal view of the situation. On this account we declined to answer the defendant's points, on the trial, except the last, which we negatived, leaving the jury to pass on the question what the contract between these parties really was, reserving the answers to the defendant's eight remaining points as matters of law which should control the case upon the finding of facts by the jury for the future action of the court. * * * Taking the submission of the case with our disposition of the points presented together, we are now of opinion that there can be no dispute as to what was manifestly reserved for the decision of this court. As matter of law, we are now of the opinion, upon reflection, that this suit was maintainable, and the only remedy which the plaintiff had. Both parties were in possession of this property at the time of suit, disputing each other's right. The defendant had the legal title, and had, by unequivocal notice to the plaintiff, chosen to make a breach of contract, which, if consummated, would have amounted to a rescission of his contract."

The defendant took this writ and, inter alia, alleged that the court erred in the refusal of his ninth point. The case was argued in this court, and on March 26th 1879, the Supreme Court affirmed the judgment of the court below. A motion was made for a reargument, and on April 3d 1879, an order issued therefor.

*William P. Bard* and *A. G. Green,* for plaintiff in error.—
Roth, while remaining in possession of the land and enjoying the rents, issues and profits, cannot maintain an action at law for the value of the improvements erected: Cornell, Executor, *v.* Vanartsdalen, 4 Barr 372. Suit was originally brought under the mistaken idea that Roth could recover for his expenditures while still in possession, and the case only contained the common counts, the object being with the recovery of a judgment to sell the land on execution, and thus enable Roth to buy the property and get rid of the liability to pay the $1500. As this object could not be attained, his action was changed by filing a special declaration, into a

[Naftzinger *v.* Roth.]

vehicle for specific performance, and by this adroit device to save the suit and fix the alleged rights of Roth by means of a special verdict. This cannot be done in this case.

There is no evidence of breach of contract on the part of Naftzinger. The only act which could be so construed is the service of the notice to quit, but it specially excepts so much of the land as the buildings occupy and as is necessary for their enjoyment, and was therefore harmless. Plaintiff's only remedy was a bill to perpetuate testimony.

To enforce specific performance of a parol contract for the sale of land, it is indispensable that the precise terms and nature of it be clearly and distinctly proved : Sage *v.* McGuire, 4 W. & S. 228 ; Ackerman *v.* Fisher, 7 P. F. Smith 457 ; Harris *v.* Richey, 6 Id. 395.

*C. H. Schaeffer* and *George F. Baer*, for defendant in error.— Roth could have waited until after the death of Naftzinger, and then sued his representatives in assumpsit and recovered the sums expended by him : Hertzog *v.* Hertzog's Administrators, 10 Casey 418 ; Ewing *v.* Thompson's Administrators, 16 P. F. Smith 382. Where a parol contract of sale is precise as to the terms and subject-matter, and the vendee has taken possession in pursuance of it, and made valuable improvements, with the assent of vendor, it is not within the Statute of Frauds ; and in such case, if the vendor brings ejectment, the jury ought to find a conditional verdict : McGibbeny *v.* Burmaster, 3 P. F. Smith 332 ; Farley *v.* Stokes, 1 Pars. Eq. 422 ; Milliken *v.* Dravo, 17 P. F. Smith 232. Specific performance has been decreed in this state in actions of covenant, debt, ejectment and assumpsit : Decamp *v.* Feay, 5 S. & R. 323 ; Haverstick *v.* The Gas Co., 5 Casey 254 ; Huber *v.* Burke, 11 S. & R. 238 ; Irvine *v.* Bull, 7 Watts 323.

Mr. Justice TRUNKEY delivered the opinion of the court, May 3d 1880.

Roth testifies : " I made an agreement with Naftzinger in the spring of 1871. He said he was old ; could no longer work ; I should move. to his property ; build house, barn and blacksmith-shop ; he wanted to live on the premises, and if I lived longer than he, I should have the property ; he said he must live on the land, but if we could not live together and were quarrelsome, he would move away, and I must pay him the interest of $1500 as long as he lived. This was the agreement, and upon this I built. * * * He had reserved for him a room in the new house. Under this agreement I built on the premises, and I wanted to give him the board right away ; he did not take it long." According to his testimony, he put up buildings and made improvements at a total cost of $3000 ; he commenced building in the spring of 1872 ; still has possession and has had the income to his own use ; after his house

was partly built had talk with Naftzinger about papers, none were drawn up; in the beginning it was said there should be papers; he and Naftzinger quarreled; the latter told him he would not live there longer than five years; quit boarding with him, and gave him notice to quit possession, except of so much of the ground as necessary for use of the buildings. Roth has paid no interest, has demanded no writing, and has not been disturbed in the actual possession of any part of the premises. Since the spring of 1872, he has possessed and enjoyed all to which he was entitled by the contract, as proved by himself.

Naftzinger's testimony differs materially as to the consideration, he saying, that the $1500 were to be paid when he should require. Neither says they agreed as to writings, both say they were talked of—both agree that Roth should have the property, if he survived, but whether Naftzinger was to secure it to him by deed or will is as uncertain in the proofs as in the pleadings.

The plaintiff, being in the enjoyment of all that came within the contract, as he stated it, abandoned his claim for damages merely, and set up a claim for specific performance to be enforced by a conditional verdict and judgment. He has as little right to maintain this suit for specific execution of the contract, without showing precisely what the contract was, his own performance, and breach by defendant, as to recover the value of improvements of which he has not been dispossessed. In this state there is no doubt, that in a proper case, the rights of the parties under a parol contract for sale of land, may be settled in assumpsit; but the plaintiff must show that his right of action had accrued before its commencement. A defendant, sued by the holder of the legal title, may plead his equity to defeat recovery, or to secure a condition to the recovery, though not in position to maintain suit himself. Roth has a heavier burden than he would have, if sued by Naftzinger for recovery of the land.

The learned judge of the Common Pleas says, "When this case was on trial, we were considerably perplexed about it. It was evident to us, that the parties to this suit had got themselves into a condition by their contract relations, which they hardly understood themselves at any time, and by which, after an attempt to execute it, they only got into a worse state of understanding, in fact into actual misunderstanding. From the demeanor of the parties towards each other, one would really have supposed that there was no comprehensible contract relations between the parties." Such was the chancellor's first impression of the case. Reflection and the verdict changed his views of the character of the evidence. Whether it was sufficient to warrant a decree for specific execution of the contract, we shall not consider; for we are of opinion, that it should clearly appear that the plaintiff had performed or offered performance on his part, before bringing suit in assumpsit, in order

[Naftzinger *v.* Roth.]

to obtain a verdict equivalent to such decree. He failed not only to show the kind of writing, if any, he was to have, but he proved no offer of writing to secure payment of the consideration, and request of Naftzinger to execute either a deed or will. The defendant's ninth point ought to have been affirmed.

Judgment reversed.